UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 21-CR-0237-CVE |
| THOMAS ANTHONY PEARCE, II, a/k/a Thomas Anthony Pearce, | ) ) ) ) |
| Defendant. | ) ) |

**OPINION AND ORDER**

Now before the Court is defendant's motion to suppress evidence (Dkt. # 33). Defendant asks the Court to suppress all evidence seized directly or indirectly as a result of a traffic stop on February 8, 2021. Defendant argues that the police officer who initiated the traffic stop lacked objective evidence that defendant was driving in excess of the speed limit, and the police officer's subsequent questioning of defendant did not relate to a possible speeding infraction. Plaintiff responds that the police officer observed a vehicle late at night in suspicious circumstances, and the police officer's belief that an occupant of the vehicle was involved in criminal activity was reasonably heightened when the driver of the vehicle attempted to flee from the scene. Plaintiff argues that the investigative detention was valid from its inception and that the investigative detention was reasonable in length. The Court held an evidentiary hearing on defendant's motion to suppress on February 16, 2022.

**I.**

At approximately 2:00 a.m. on the morning of February 8, 2021, Jenks Police Department (JPD) Corporal Robert Golliday was on patrol in Jenks, Oklahoma. Golliday was driving his marked

police vehicle headed eastbound on 131st Street South, and he observed a white pickup truck parked near a construction site in an unlit area. The JPD had previously received reports of construction site theft and vehicle break-ins in the vicinity, and Golliday testified that he had not previously seen a vehicle parked in that location on his regular patrols through the area. Golliday turned on his side alley light to illuminate the truck as he drove by, and Golliday observed a person in the vehicle. Golliday was concerned that a crime was being committed, that the driver of the vehicle was possibly intoxicated, or that someone in the vehicle needed assistance. Golliday drove past the vehicle and turned around, and the white pickup truck was accelerating down the road at high speed away from Golliday's vehicle when Golliday returned to the location. Based on his training and experience, Golliday determined that the pickup truck was driving faster than the posted speed limit of 45 miles per hour. Golliday activated the overhead lights on his vehicle and pursued the white pickup truck, and the white pickup truck slowly came to a stop after bypassing several places where the driver of the truck could have safely stopped in a well-lit area.

At approximately 2:06 a.m., Golliday approached the driver's side door of the white pickup truck, and the driver's side window was already rolled down. Golliday asked the driver, Thomas Anthony Pearce, II, for his driver's license, and the Pearce produced his license. Golliday observed a juvenile female sitting in the front passenger seat of the truck, and Golliday asked the Pearce about the juvenile female. Pearce said that the juvenile was his niece and that she was depressed. Golliday asked Pearce why he was parked in a vehicle with the juvenile female in the dark, and Pearce said that they were just talking. Golliday noticed that the juvenile female was looking at the floor and did not look at Golliday while they were talking about her. Golliday decided that he wanted to speak to the juvenile female outside the presence of Pearce, and he called for backup to help him. Golliday

returned to his vehicle and confirmed that a backup officer was on the way. Golliday also provided the dispatcher with Pearce's driver's license number and asked for a criminal history check on Pearce.

By 2:10 a.m., the backup officer, Master Patrol Officer Trevor Pierce, had arrived on the scene, and Golliday asked Pierce to talk the juvenile female while Golliday continued to speak to Pearce. Golliday asked Pearce where the juvenile female's parents were, and Pearce replied that they were at home. Golliday asked if the parents knew that the juvenile female was with Pearce, and Pearce stated that he did not know but she was supposed to have told her parents where she was going. Golliday tried to establish Pearce's relationship to the juvenile female by asking if she was niece through a brother or sister, and Pearce vaguely responded that it was a "step" relationship. Golliday asked if Pearce would call the juvenile female's parents to let them know that she was "out and about," but Pearce stated that he did not know their phone number. At 2:12 a.m., Golliday went to speak with the juvenile female, identified as B.P., and B.P. stated that she was high because Pearce had given her weed. B.P. claimed that she met Pearce online with the impression that Pearce was a different person, and Golliday asked B.P. if Pearce had done anything to her. She replied "not this time," and Golliday asked if Pearce had done anything to her some other time. B.P. told Golliday that she was 16 years old and that Pearce had threatened her with use of force to encourage her to sneak out of her house. Golliday asked Pierce to help B.P. prepare a witness statement, and he went to speak with another backup officer who had arrived on the scene. Golliday returned to speak to B.P and asked her how she got out of the house. B.P stated that she climbed out of a window to meet Pearce, because he had threatened kidnap her brother and sister and use them for

"trafficking" if B.P. did not meet him. Golliday requested medical assistance for B.P. because she had been given drugs, and B.P. stated that her chest felt tight.

At 2:16 a.m., Golliday approached Pearce's vehicle and instructed him to step out of the vehicle. Golliday handcuffed Pearce and gave him a Miranda[1] warning. Pearce stated that he understood his rights and he did not wish to speak to Golliday. Golliday placed Pearce in the back of his patrol vehicle, and Golliday asked a backing officer to supervise Pearce. The entire encounter from the inception of the stop to placing Pearce under arrest took 11 minutes. Golliday asked a backup officer to perform an inventory search of Pearce's vehicle. In response to further questioning, B.P. stated that Pearce had zip tied her hands and taken pictures of her without her clothes on a previous occasion. The inventory search found zip ties, tape, and marijuana in Pearce's vehicle. Based on information gathered during the investigate detention, police obtained search warrants for defendant's home and electronic devices in defendant's possession. On May 19, 2021, a grand jury returned an indictment charging Pearce with coercion or enticement of a minor (count one), production of child pornography (count two), possession of child pornography (count three), and distribution of marijuana (count four). Dkt. # 15.

## II.

Defendant argues that Golliday failed to gather any objective evidence that Pearce was speeding, and that the traffic stop was illegal from its inception. He also argues that none of Golliday's questions to defendant had anything to do with a potential speeding violation, and Golliday exceeded the permissible scope of a traffic stop by investigating an unrelated crime. Plaintiff responds that a speeding violation was not the sole basis for the traffic stop, and the totality

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

of the circumstances supported Golliday's belief that he had reasonable suspicion to stop the vehicle to investigate potential criminal activity. Plaintiff also argues that the length of the traffic stop was reasonable.

The Court must consider whether Golliday had a valid basis to initiate an investigative detention of defendant's vehicle and whether the length of the detention was reasonable. A traffic stop is treated as an investigative detention, and such a stop is governed by the standards set forth in Terry v. Ohio, 392 U.S. 1 (1968). United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005). In determining the reasonableness of a traffic stop, a court must make two separate inquiries. The first is whether the police officer had a valid reason for initiating the traffic stop. United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995). "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." Id. Second, a traffic stop must not become an unnecessarily lengthy detention, but must be limited in scope to the purpose of the initial traffic stop. United States v. Rice, 483 F.3d 1079,1083 (10th Cir. 2007). A police officer may extend the length of the traffic stop for questioning beyond the initial purpose of the traffic stop only if the officer has "an objectively reasonable and articulable suspicion that illegal activity has occurred, or the driver voluntarily consents to further questioning." United States v. Ramirez, 479 F.3d 1229, 1243 (10th Cir. 2007).

The Court must also consider whether the length of the investigative detention was reasonable under the second prong of Terry. An officer conducting a traffic stop may request a driver's license, vehicle registration, run a computer check, and issue a citation. See United States v. Zubia-Melendez, 263 F.3d 1155, 1161 (10th Cir. 2001). An officer may also "ask questions about

5

the motorist's travel plans and authority to operate the vehicle," in addition to obtaining the relevant documentation, without exceeding the scope of an investigative detention. United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006).  Such questioning does not violate the Fourth Amendment as long as the questioning does not prolong the traffic stop. United States v. Villa, 589 F.3d 1334, 1339 (10th Cir. 2009); United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005). Police must have reasonable suspicion that criminal activity is afoot to continue a traffic stop beyond the purpose of issuing a warning or citation for the traffic violation. United States v. Kopp, 45 F.3d 1450, 1453 (10th Cir. 1995).  Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity." Ornelas v. United States, 517 U.S. 690, 696 (1996) (internal quotation marks omitted).  An "inchoate and unparticularized suspicion or 'hunch' is insufficient" to support reasonable suspicion. United States v. Hall, 978 F.2d 616, 620 (10th Cir. 1992) (internal quotations and citations omitted).  Reasonable suspicion "represents a minimum level of objective justification which is considerably less than proof of wrongdoing by a preponderance of the evidence." Alcaraz-Arellano, 441 F.3d at 1260 (quoting United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997)).  In determining whether an officer had reasonable suspicion of criminal activity, the Court does not evaluate the facts in isolation but instead construes them together based on the totality of the circumstances. United States v. Arivizu, 534 U.S. 266, 274 (2002).

      Defendant focuses solely on the potential speeding violation as the basis for the investigative detention, and he cites United States v. Sowards, 690 F.3d 583 (10th Cir. 2012), for the proposition that a police officer's estimation of a vehicle's speed may not be sufficient to establish reasonable suspicion to support a traffic stop.  However, the evidence establishes that Golliday was relying on

a range of factors to form a belief that there was reasonable suspicion to believe that defendant's vehicle was being used in furtherance of criminal activity, and Golliday did not stop the vehicle solely to investigate a speeding violation. Golliday had observed the vehicle parked in an unlit area at approximately 2:00 a.m in area where he had never seen a vehicle parked. The lights of the vehicle were off, but Golliday used his alley light to determine that at least one person was inside the vehicle. Golliday testified that JPD had received reports of construction site theft and vehicle break-ins in the area, and the vehicle was parked next to a construction site. These facts alone would have merited further investigation and Golliday would have been permitted to approach the vehicle to conduct a limited investigation even if defendant had not driven away. Instead, defendant fled the area at a high rate of speed and it appeared to Golliday that the driver of the vehicle was attempting to flee. Golliday testified that he believed the vehicle was driving in excess of the speed limit, but neither Golliday's testimony nor his police report suggests that he initiated the stop solely based on a speeding violation. Dkt. # 33-1, at 1. Considering the totality of the circumstances, the Court finds that Golliday had reasonable suspicion to initiate an investigative detention of defendant's vehicle based on the time of day, the unusual location of the vehicle, reports of crime in the area, and the obviously suspicious behavior of driving away from Golliday at a high rate of speed.

The Court must next consider whether the length of the investigative detention was reasonable. A police officer must typically end an investigative detention once the initial purpose of the stop has been fulfilled, but a police officer may extend the detention if he "develops an objectively reasonable and articulable suspicion that the driver is engaged in some illegal activity." United States v. Morales, 961 F.3d 1086, 1091 (10th Cir. 2022). In this case, approximately 11 minutes elapsed from the inception of the investigation detention to the time that Golliday placed

defendant under arrest, and the limited duration of the encounter strongly suggests that investigative detention was not unreasonably lengthy. The purpose of the encounter was not solely to investigate a speeding violation, and Golliday had reasonable suspicion to believe that some other type of criminal activity could be ongoing. Golliday approached defendant's vehicle and immediately observed a juvenile female who reasonably appeared to be in danger, and he promptly removed her from the vehicle for limited questioning. Golliday and the backup officer quickly determined that the juvenile female had been given illegal drugs and that she was very likely the victim of a crime committed by defendant. Golliday's activities fell squarely within the scope of his reason for initiating an investigate detention of the vehicle, and the Court finds that investigative detention was reasonable in length. The Court does not need to consider whether Golliday has reasonable suspicion to extend the stop beyond its initial purpose, because Golliday completed the investigative detention's purpose of determining whether the occupant of the vehicle was engaged in illegal activity when he placed defendant under arrest. However, even if there was some break during the encounter that ended the initial investigative detention, Golliday plainly had reasonable suspicion of ongoing criminal activity to believe that defendant was engaged in illegal activity that would warrant an extension of the investigative detention.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress evidence (Dkt. # 33) is **denied**.

**DATED** this 18th day of February, 2022.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE